[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 30, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-12536

_____

D. C. Docket No. 02-20572-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS GONZALEZ-LAUZAN, JR.,
a.k.a. Luis Gonzalez, Jr.,
a.k.a. Luisito,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 30, 2006)**

Before HULL, MARCUS and HILL, Circuit Judges.

HULL, Circuit Judge:

Appellant Luis Gonzalez-Lauzan, Jr. ("Gonzalez-Lauzan") appeals his conviction on one count of premeditated murder of a federal informant and related counts of conspiracy and firearms offenses. Gonzalez-Lauzan contends that he was interrogated by police in violation of his Fifth and Sixth Amendment rights, and that the district court erred by denying his motion to suppress statements he made after he was read Miranda warnings.[1] The district court suppressed his statements made before the warnings, but Gonzalez-Lauzan argues that the district court also should have suppressed his statements made after the warnings because of the continuous interrogation and the police's delay in administering the warnings. After review and oral argument, we affirm.

## I. FACTS

In January 2002, Alexander Texidor ("Texidor") was arrested by federal authorities for the illegal purchase of firearms. Following his arrest, Texidor agreed to cooperate with law enforcement. Texidor's cooperation led to the January 8, 2002, arrest of Luis Gonzalez-Lauzan, Senior ("Senior"), Gonzalez-Lauzan's father, on firearms charges.

Attorney Peter Raben ("Raben") represented Senior. In January 2002, Raben met with Senior several times, usually in the presence of Senior's son,

---

[1]See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

2

Gonzalez-Lauzan. According to Raben's subsequent testimony, prior to the death of Texidor, Senior had decided to resolve the firearms charges against him by plea. However, on January 28, 2002, Texidor was murdered.

In either March or April 2002, Gonzalez-Lauzan was incarcerated at the Federal Detention Center in Miami for a violation of supervised release on a prior conviction. This incarceration was unrelated to the death of Texidor. Gonzalez-Lauzan retained Raben, the same attorney who had represented his father, to represent him with respect to his supervised release violation. Sometime in June or July 2002, Gonzalez-Lauzan resolved the violation of supervised release by an agreement to serve ten months' incarceration.

On July 11, 2002, Gonzalez-Lauzan and three co-defendants, including Senior, were indicted on charges related to the murder of Texidor. On September 18, 2002, Senior was arrested and made his initial appearance in the Texidor matter, represented by Raben.

The interview of Gonzalez-Lauzan at issue in this case also occurred on September 18, 2002. On March 27, 2003, Gonzalez-Lauzan moved to suppress incriminating statements he made to the officers during that interview. The district court referred Gonzalez-Lauzan's motion to suppress to a magistrate judge, who held a hearing. On June 5, 2003, the magistrate judge submitted a Report and

3

Recommendation making findings about the interview which the district court later adopted in full. The parties do not dispute that the interview transpired as follows.

On September 18, 2002, Gonzalez-Lauzan was serving his sentence for violating supervised release on a previous conviction; he had not yet been arrested or made his initial appearance on the murder indictment in this case. That afternoon, Hialeah, Florida Police Officer Albert Nabut ("Nabut"), Hialeah Police Detective Ralph Nazario ("Nazario") and Special Agent Jackie Elbaum ("Elbaum") of the Bureau of Alcohol, Tobacco, and Firearms (collectively, "officers"), took Gonzalez-Lauzan out of the Federal Detention Center to an interview room in the courthouse. Once in the interview room, the three officers spent between two-and-a-half and three hours talking to Gonzalez-Lauzan.

The three officers made a decision not to administer Miranda warnings to Gonzalez-Lauzan at the beginning of this meeting. Instead, the officers decided that they would simply describe to Gonzalez-Lauzan the evidence the government had accumulated against him with respect to his involvement in Texidor's murder. The officers hoped that the strength of this evidence would persuade Gonzalez-Lauzan to talk about his participation in the killing of Texidor. The officers

4

planned to give Gonzalez-Lauzan <u>Miranda</u> warnings only if it became apparent that Gonzalez-Lauzan would be willing to make a custodial statement.

The officers began the session by explaining to Gonzalez-Lauzan that they were working on a murder investigation, that they believed Gonzalez-Lauzan was involved in the murder, and that they knew Gonzalez-Lauzan had been represented by counsel previously. Gonzalez-Lauzan responded, "I know my rights." Before proceeding further, the officers instructed Gonzalez-Lauzan that "we are not asking you any questions. We don't want you to say anything. We just have something to say to you and we ask that you listen to it so that you can understand where we are coming from."

After this introductory admonition, the officers described the evidence they had accumulated against Gonzalez-Lauzan in detail. They told Gonzalez-Lauzan that his father had been arrested in relation to Texidor's death. The officers explained that they had done extensive surveillance of Gonzalez-Lauzan and his family, had analyzed phone records and had obtained the cooperation of one of Gonzalez-Lauzan's co-conspirators, all leading them to believe that Gonzalez-Lauzan had orchestrated the murder of Texidor.

At several points during this description, the officers instructed Gonzalez-Lauzan just to listen and told him that the officers did not have any questions.

5

Gonzalez-Lauzan mostly listened to the evidence, occasionally saying things like, "I'm no mastermind," " I'm not the kingpin," or "I'm not the person." At times, the officers would allow a few minutes of silence to see if there was any response from Gonzalez-Lauzan.

Approximately two-and-a-half hours into the meeting, Gonzalez-Lauzan stated suddenly, "okay, you got me." Gonzalez-Lauzan was then immediately read his Miranda rights. Gonzalez-Lauzan signed a form indicating that he understood his Miranda rights and agreed to waive them and speak to law enforcement.

At the onset of the postwarning interrogation, Gonzalez-Lauzan indictated that he would prefer not to answer any questions about his father. In response to Gonzalez-Lauzan's request, the officers agreed and did not ask him any questions about his father. During the interrogation, Gonzalez-Lauzan made multiple incriminating statements. Gonzalez-Lauzan admitted that he instructed the co-conspirators to teach Texidor a lesson, that he had provided the murder weapon and silencer to co-defendant James Wiggins, and that he had been present when Wiggins shot and killed Texidor.

In his motion to suppress, Gonzalez-Lauzan argued that the district court should suppress his statements made both before and after he signed the waiver of his Miranda rights. Gonzalez-Lauzan argued that at the time of the interview he

6

was represented by an attorney, Raben, and that Gonzalez-Lauzan had invoked his right to counsel. Gonzalez-Lauzan also contended that he was interrogated in violation of his Fifth Amendment rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

The magistrate judge recommended that Gonzalez-Lauzan's pre-Miranda statements be suppressed, but that the statements made after waiving his Miranda rights should be admitted. Citing Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct 1682 (1980), the magistrate judge concluded that even though the officers had not asked Gonzalez-Lauzan any questions during the first portion of the interview, their presentation of evidence to Gonzalez-Lauzan under the circumstances constituted "the functional equivalent" of express questioning because Gonzalez-Lauzan's pre-Miranda statement "was not spontaneous but was in response to words and actions on the part of the police, that the police knew were likely to elicit an incriminating response." See Innis, 446 U.S. at 300-01, 100 S. Ct. at 1689. As such, the magistrate judge recommended that the district court suppress the statement, "okay, you got me," which Gonzalez-Lauzan made before being read his Miranda rights.

The magistrate judge next found that once the officers read Gonzalez-Lauzan his Miranda rights, Gonzalez-Lauzan waived those rights "knowingly,

7

freely and voluntarily." The magistrate judge noted that Gonzalez-Lauzan "understand[s] and reads and writes English, he went to high school and appeared to understand and affirmatively waive his <u>Miranda</u> rights." The magistrate judge also found that "[d]uring the meeting, there was no hostility between the parties and all the parties were respectful of each other . . . . There were no threats or coercion by police." The magistrate judge found that Gonzalez-Lauzan had previously received counsel from Raben, but made no findings as to whether Raben was representing Gonzalez-Lauzan at the time of the interview.[2] Rather, the magistrate judge determined that, in any event, Gonzalez-Lauzan did not ask to speak to an attorney and did not advise law enforcement that he was represented by counsel at any time during the September 18, 2002 interview.[3] Based on these facts, the magistrate judge recommended that the district court deny Gonzalez-Lauzan's motion to suppress with respect to the statements Gonzalez-Lauzan made after signing the waiver of his <u>Miranda</u> rights.

---

[2]At the suppression hearing, Raben testified that he had represented Gonzalez-Lauzan concerning his supervised release violation and during the Texidor murder investigation, but that he was not representing Gonzalez-Lauzan on the murder indictment, because Raben would not be able to represent both Gonzalez-Lauzan and his father, Senior, on the Texidor matter.

[3] Shortly after being read his <u>Miranda</u> rights, Gonzalez-Lauzan asked the officers if he could speak to another inmate and talk to the officers "tomorrow." The officers advised that they were "not sure they would be there tomorrow," but also reiterated that Gonzalez-Lauzan did not need to answer questions or give a statement if he did not want to. Gonzalez-Lauzan agreed to talk without delay.

On July 3, 2003, the district court affirmed and adopted the Report and Recommendation without revision, denying objections by both parties. The district court therefore suppressed the statement, "okay, you got me," but denied Gonzalez-Lauzan's motion to suppress with respect to all other statements.

A jury trial was held between January 20, 2004, and January 29, 2004. On January 29, 2004, the jury returned a verdict finding Gonzalez-Lauzan guilty of seven charges, including the intentional killing of Texidor, in violation of 18 U.S.C. §1512(a)(1)(A). On May 17, 2004, Gonzalez-Lauzan was sentenced to life imprisonment. In his direct appeal, Gonzalez-Lauzan now challenges the district court's ruling on his motion to suppress on both Fifth and Sixth Amendment grounds.[4]

## II. FIFTH AMENDMENT CLAIM

### A.    Elstad and Seibert

In arguing about the admissibility of Gonzalez-Lauzan's postwarning statements, both parties focus on the Supreme Court decisions in Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285 (1985), and Missouri v. Seibert, 542 U.S. 600, 124

---

[4]In reviewing a district court's denial of a motion to suppress, this court reviews factual findings for clear error and the application of the law to those facts de novo. United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004). Gonzalez-Lauzan raises no other issues in this direct appeal.

S. Ct. 2601 (2004), two cases addressing delayed Miranda warnings administered after the police had already begun questioning a defendant. Gonzalez-Lauzan contends that Seibert controls and renders his statements inadmissible. The government asserts that Seibert is materially different and that Elstad controls. Alternatively, the government contends that Gonzalez-Lauzan's warned statements are admissible under Seibert. Thus, before discussing Gonzalez-Lauzan's case, we review both decisions in detail.

In Elstad, the Supreme Court concluded that even where a suspect, while in custody, has answered unwarned questions from police, the suspect still may validly waive his Miranda rights and provide admissible statements after Miranda warnings. Elstad, 470 U.S. at 314, 105 S. Ct. at 1296. According to Elstad, "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Id.

In Elstad, a witness to a burglary contacted the police and told them that Michael Elstad, an eighteen-year old male, had committed the burglary. Id. at 300, 105 S. Ct. at 1288. After obtaining a warrant for Elstad's arrest, two police officers drove to Elstad's home. Id. Elstad's mother answered the door and led the officers into the house. Id. While one officer talked to Elstad's mother in the

10

kitchen, the other asked Elstad to get dressed and to accompany the officer to the living room. Id. The officer, armed with an arrest warrant, then directly questioned Elstad about the crime without giving him any Miranda warnings.

According to the officer's testimony, the following exchange occurred between the officer and Elstad:

> "I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'"

Id. at 301, 105 S. Ct. at 1288-89. The government conceded that Elstad was in custody at the time of this interrogation. Id. at 315, 105 S. Ct. at 1296.

After asking Elstad these questions without the benefit of a Miranda warning and obtaining an incriminating answer from Elstad, the officers transported Elstad to headquarters. Id. at 301, 105 S. Ct. at 1289. Approximately one hour later, the officers for the first time advised Elstad of his Miranda rights. Id. Elstad waived his rights and gave a full written confession, explaining that he had robbed the Gross house because he knew they were out of town. Id. Elstad "concede[d] that the officers made no threats or promises either at his residence or at the Sheriff's office." Id. at 302, 105 S. Ct. at 1289.

11

It was conceded that Elstad's prewarning statement, "I was there," was properly excluded as obtained in violation of Miranda. Id. However, the Supreme Court concluded that despite the officers' initial failure to give Elstad the Miranda warnings, Elstad's postwarning confession remained admissible. The Supreme Court remarked on the presumption underlying Miranda that "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." Id. at 308, 105 S. Ct. at 1293. According to the Supreme Court, "[t]hough Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. at 309, 105 S. Ct. at 1293. The Supreme Court concluded that Elstad had given the written confession freely and voluntarily and not as the result of police coercion. Id. at 314, 105 S. Ct. at 1296.

Subsequent to Gonzalez-Lauzan's trial, in Missouri v. Seibert, the Supreme Court considered again the admissibility of statements made after belated Miranda warnings during continuing interrogations. In Seibert, the police awakened Seibert at 3:00 a.m. at a hospital where her son was being treated for burns. Seibert, 542 U.S. at 604, 124 S. Ct. at 2606 (plurality opinion). The police arrested Seibert and took her to the police department. Id. The police then

12

followed departmental instructions to refrain from administering <u>Miranda</u> warnings prior to first questioning suspects. <u>Id.</u> The police pursued a deliberate strategy of giving Seibert <u>Miranda</u> warnings only after interrogating her and drawing out a confession. <u>Id.</u> at 605-06, 124 S. Ct. at 2606. The plurality described the strategy as designed to undermine the effectiveness of <u>Miranda</u> warnings by deliberately giving them only after a suspect had already confessed. <u>Id.</u> at 609-11, 124 S. Ct. at 2608-09.

More specifically, the police questioned the defendant Seibert extensively for between thirty and forty minutes without reading any <u>Miranda</u> warnings. <u>Id.</u> at 604-05, 124 S. Ct. at 2606. After Seibert had admitted guilt and answered the police's extensive and detailed questions, the police gave her a twenty minute break. The police then issued the <u>Miranda</u> warnings to Seibert and obtained a signed waiver of her rights. <u>Id.</u> at 605, 124 S. Ct. at 2606. The police turned on a tape recorder and resumed questioning. <u>Id.</u> The police rehashed the ground covered in the first, unwarned interrogation, prodding Seibert to give the same responses she had given previously. <u>Id.</u>

A plurality of four Justices found that this deliberate "question-first" technique rendered Seibert's postwarning statements inadmissible. <u>Id.</u> at 617, 124 S. Ct. at 2613. The plurality pointed out that "[t]he object of question-first is to

13

render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 611, 124 S. Ct. at 2610. The plurality rejected as "absurd" the idea that "mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance." Id. Rather, "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." Id. at 611-12, 124 S. Ct. at 2610.

The plurality distinguished Elstad from Seibert's case by noting that in Elstad the officer's failure to give Miranda warnings was "arguably innocent neglect" or a "good-faith Miranda mistake." Id. at 615, 124 S. Ct. at 2612. The plurality emphasized that the facts in Seibert were at "the opposite extreme" of Elstad and "by any objective measure reveal[ed] a police strategy adapted to undermine the Miranda warnings."[5] Id. at 616, 124 S. Ct. at 2612.

The plurality then outlined five factors "that bear on whether Miranda warnings delivered midstream could . . . accomplish their object." Id. at 615, 124 S. Ct. at 2612. These considerations included:

---

[5]The dissent asserted that "the plurality gives insufficient deference to Elstad." Seibert, 542 U.S. at 629, 124 S. Ct. at 2620 (O'Connor, J., dissenting). In the dissent's view, the admissibility of Seibert's warned statements should have been evaluated solely "under the voluntariness standards central to the Fifth Amendment and reiterated in Elstad." Id. at 628, 124 S.Ct. at 2619. The dissent advocated remanding the case to determine whether Seibert's warned statements were made involuntarily. Id.

14

[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. The plurality then applied these factors in determining whether the midstream warnings given to defendant Seibert served their purpose.

With respect to the first two factors, the plurality observed that "[t]he unwarned interrogation [of Seibert] was . . . systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." Id. at 616, 124 S. Ct. at 2612. With respect to factors three and four, the plurality noted that the warned interrogation proceeded in the same location as the unwarned interrogation, occurred only fifteen to twenty minutes later, and was conducted by the same officer who had interrogated Seibert already. Id. With respect to factor five, the plurality stated that the police did not advise Seibert that her unwarned statements could not be used, but rather treated the warned interrogation as a mere continuation of the unwarned interrogation, making it difficult for Seibert to refuse to repeat what she had said before. Id. at 616-17, 124 S. Ct. at 2612-13. The plurality concluded that "[t]hese circumstances must be seen as challenging the

15

comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." Id. at 617, 124 S. Ct. at 2613. (emphasis added).

Justice Kennedy concurred in the judgment only and provided the fifth vote for the majority in Seibert. Justice Kennedy agreed with the plurality that the particular "question-first" technique as employed in Seibert "undermines the Miranda warning and obscures its meaning." Seibert, 542 U.S. at 618, 124 S. Ct. at 2614 (Kennedy, J., concurring). Justice Kennedy agreed with the majority's point that the two-step technique used with Seibert "permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made." Id. at 620, 124 S. Ct. at 2615. Justice Kennedy stressed that the strategy and technique used in questioning Seibert is based on the assumption that Miranda will mean less to a defendant "when recited midinterrogation, after inculpatory statements have already been obtained." Id. After noting that the interrogating officer relied on Seibert's prewarning statements to obtain the postwarning statements, Justice Kennedy pointed out that "[t]he postwarning interview resembled a cross-examination" and "[t]he officer

16

confronted the defendant with her inadmissible prewarning statements and pushed

her to acknowledge them." Id. at 621, 124 S. Ct. at 2615.

However, Justice Kennedy disagreed with the plurality's use of a

"multifactor test that applies to every two-stage interrogation." Id. at 621-22, 124

S. Ct. at 2615-16. Justice Kennedy stated that "Miranda's clarity is one of its

strengths," and that the plurality's test "cuts too broadly" and "may serve to

undermine that clarity." Id. at 622, 124 S. Ct. at 2616. Rather, Justice Kennedy

advocated "a narrower test applicable only in the infrequent case, such as [in

Seibert], in which the two-step interrogation technique was used in a calculated

way to undermine the Miranda warning." Id. (emphasis added).[6] Justice Kennedy

proposed that

> [t]he admissibility of postwarning statements should continue to be
> governed by the principles of Elstad unless the deliberate two-step
> strategy was employed. If the deliberate two-step strategy has been
> used, postwarning statements that are related to the substance of

---

[6]In Seibert, Justice Kennedy provided the fifth vote to suppress Seibert's warned statements, which we quote above, and he concurred on the narrowest grounds. Seibert, 542 U.S. at 618, 124 S. Ct. at 2614 (Kennedy, J., concurring). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990 (1977) (quotation marks omitted).

prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.[7]

Id. Thus the type of two-step questioning that falls within Justice Kennedy's narrow concurrence is the type used in Seibert, where officers in a calculated manner first obtained unwarned incriminating statements from a suspect, and then used those incriminating statements in the warned interrogation in order to undermine the midstream Miranda warnings.

According to both the plurality and Justice Kennedy, the key problem with the "question-first" technique or strategy as employed in Seibert is that it potentially renders ineffective the message intended to be conveyed by the Miranda warnings. Once a defendant has incriminated himself by answering a series of detailed questions about his involvement in criminal activity and there is little of incriminating potential left unsaid, a midstream warning that instructs him of his right to refrain from answering those exact kinds of questions may fail to

---

[7]Justice Kennedy explained that "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Seibert, 542 U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring).

The dissent criticized Justice Kennedy for focusing on the police's subjective intent in withholding Miranda warnings. Id. at 629, 124 S. Ct. at 2620 (O'Connor, J., dissenting). In the dissent's view, "[Justice Kennedy's] approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect." Id. at 627, 124 S. Ct. at 2618-19.

"reasonably convey that he could choose to stop talking." Id. at 612, 124 S. Ct. at 2610 (plurality opinion).

## B.    Gonzalez-Lauzan's Warned Statements

With this background, we proceed to analyze Gonzalez-Lauzan's case. For purposes of our analysis, we assume, but do not decide, that the initial interaction between Gonzalez-Lauzan and the police constituted an interrogation and that Miranda warnings were applicable at the outset of the meeting. Given that the police did not ask Gonzalez-Lauzan any questions and three times instructed him explicitly just to listen, it is not clear that the first portion of the officers' interview of Gonzalez-Lauzan constitutes an "interrogation" under Innis. However, on appeal the government does not challenge the magistrate judge's ruling that the first segment was the "functional equivalent" of an interrogation or that the district court was correct to exclude Gonzalez-Lauzan's prewarning statement, "okay, you got me."

Rather, the government argues that Seibert is wholly inapplicable because the officers did not ask Gonzalez-Lauzan any questions in the first segment and did not deliberately use an interrogation technique designed to undermine the effectiveness of the Miranda warnings by obtaining unwarned incriminating statements and then using them in the warned segment in order to undermine the

19

effectiveness of the Miranda warnings. Instead, the officers withheld the warnings only in an attempt to gain credibility and establish rapport with Gonzalez-Lauzan and always intended to give warnings before asking him any questions. The government stresses that the officers' intent not to engage in any prewarning questioning is evidenced by (1) the investigator's introductory admonition, (2) the officers' repeating three times that they were not going to ask questions and he should just listen, and (3) the officers' reading of the Miranda warnings immediately upon Gonzalez-Lauzan stating "okay, you got me" and without first pursuing any questioning or obtaining any detail. The government argues that the magistrate judge correctly found that Gonzalez-Lauzan understood and waived his Miranda rights knowingly, freely, and voluntarily.

In reply, Gonzalez-Lauzan emphasizes that Seibert's focus is not on whether questions were actually asked but on whether there was a two-step interrogation in which the police deliberately withheld Miranda warnings during the first segment. Gonzalez-Lauzan stresses that Seibert is triggered when a two-step interrogation is involved and Miranda warnings are applicable at the outset but the police make a deliberate decision to withhold those warnings. Gonzalez-Lauzan points out that on appeal the government does not dispute that the first phase was an interrogation, that Miranda applied, and that the police intentionally delayed

20

<u>Miranda</u> warnings. According to Gonzalez-Lauzan, <u>Seibert</u> controls, the police's two-step technique undermined his <u>Miranda</u> warnings, and his postwarning statements are inadmissible.

We need not resolve this dispute over whether <u>Elstad</u> or <u>Seibert</u> controls, because although <u>Elstad</u> is at one extreme and <u>Seibert</u> is at another extreme, both decisions provide important guidance. Under both decisions, the question here becomes whether Gonzalez-Lauzan voluntarily waived his <u>Miranda</u> rights. In answering that question, <u>Elstad</u> relied on a presumption that a defendant's waiver is voluntary in the absence of circumstances showing otherwise. <u>Elstad</u>, 470 U.S. at 309, 105 S. Ct. at 1293. In contrast, the <u>Seibert</u> plurality looked more to whether the <u>Miranda</u> warnings given to a reasonable person in the suspect's shoes could function effectively as <u>Miranda</u> requires, and required a multifactor test to determine their effectiveness. <u>Seibert</u>, 542 U.S. at 615, 124 S. Ct. at 2612 (plurality opinion). The fifth vote in <u>Seibert</u> more narrowly concluded that midstream <u>Miranda</u> warnings did not function effectively when the officers in a calculated way first obtained warned statements, and then used them in the warned segment to undermine the midstream warnings. <u>Id.</u> at 618, 124 S. Ct. at 2614 (Kennedy, J., concurring). Having carefully considered both decisions and the record in this case, we conclude that the <u>Miranda</u> warnings in Gonzalez-Lauzan's

21

circumstances could and did function effectively, that Gonzalez-Lauzan voluntarily waived his Miranda rights, and that Gonzalez-Lauzan's warned statements are admissible under both Elstad and Seibert.

First, the two-step interrogation in this case, albeit continuous, is materially different from that in Seibert. Seibert involved a two-step technique adapted to obscure the Miranda warnings by not giving them until after the defendant had confessed, and then using the defendant's own incriminating statements to pressure him to repeat them in the warned segment of the interrogation. In sharp contrast with Seibert, the officers asked no questions of Gonzalez-Lauzan at all during the first segment, nor did Gonzalez-Lauzan offer any detailed information concerning his involvement in Texidor's murder until after he had waived his Miranda rights. Moreover, during the first segment, the officers at several points told Gonzalez-Lauzan just to listen and that they did not have any questions for him. Indeed, the magistrate judge expressly found that there were no threats or coercion by the police and Gonzalez-Lauzan understood his Miranda rights. There was no hostility, and all parties were respectful of each other. Accordingly, we conclude that the Miranda warnings did function effectively in Gonzalez-Lauzan's circumstances and that Gonzalez-Lauzan has shown no error in the magistrate judge's finding that he knowingly and voluntarily waived his Miranda rights.

22

Second, and more importantly, even assuming Seibert controls and applying both the multifactor test of the Seibert plurality and Justice Kennedy's narrower test, it is clear that the Miranda warnings as administered in Gonzalez-Lauzan's case would meaningfully apprise a reasonable suspect of his right or choice to remain silent and were thus effective in this case.

With respect to the Seibert plurality's multifactor test, the first factor to consider is whether the prewarning questions and answers were complete and detailed. Id. Because Gonzalez-Lauzan was asked no questions and gave no answers before he received the Miranda warnings, the first factor strongly suggests that the warnings were effective.

The second factor concerns the degree to which the defendant's prewarning and postwarning statements overlapped. Given that Gonzalez-Lauzan made only a single brief incriminating statement in the prewarning stage of the interview, the complete interrogation of Gonzalez-Lauzan that followed the warnings bore little resemblance to his prewarning statement. Seibert stressed that after the police finished the unwarned phase of the interrogation, "there was little, if anything, of incriminating potential left unsaid." Id. at 616, 124 S. Ct. at 2612 (plurality opinion). In contrast, the only statement Gonzalez-Lauzan made during the unwarned interrogation was, "okay, you got me." All the detailed incriminating

23

statements Gonzalez-Lauzan made after he had waived his Miranda rights. While this case involves a two-step interrogation, the technique employed by the officers during the first phase is wholly different from that used in Seibert. As such, the second factor mentioned by the plurality also demonstrates strongly that Gonzalez-Lauzan's postwarning statements were properly admitted.

The third and fourth considerations mentioned by the Seibert plurality focus on the timing and setting of the two rounds of questioning. Id. at 615, 124 S. Ct. at 2612. Although these factors clearly favor Gonzalez-Lauzan, they carry little weight in light of the fact that Gonzalez-Lauzan was asked no questions and gave no answers in the first phase of the interview.

As to the fifth factor, the continuity of the two rounds of questioning, Seibert focused on whether it would have been unnatural at the second stage to repeat what had been said during the first stage. Id. at 616-17, 124 S. Ct. at 2613. In this case, because Gonzalez-Lauzan said very little in the first stage, there was virtually nothing for him to repeat during the second round of interrogation. Thus, it remained objectively reasonable for him to refuse to make incriminating statements during the second phase. Indeed, during the second phase, Gonzalez-Lauzan refused to answer the officers' questions about his father, demonstrating

24

that Gonzalez-Lauzan understood that he retained a choice whether to answer or not.

Accordingly, even under the <u>Seibert</u> plurality's multifactor test, the prewarning interaction did not render the <u>Miranda</u> warnings ineffective to a reasonable suspect, and Gonzalez-Lauzan's waiver of his <u>Miranda</u> rights was voluntary and constitutionally valid.[8]

Additionally, and importantly, we cannot say that the two-step technique employed here is of the type that was the narrow focus of Justice Kennedy's opinion. His opinion rejected applying the plurality's multifactor test to every two-stage interrogation. The officers here did not engage in the type of two-stage questioning or strategy which Justice Kennedy concluded distorted <u>Miranda</u> and required <u>Miranda</u> plus curative steps. <u>Seibert</u>, 542 U.S. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring). The first phase here did not seek to elicit any incriminating statements as occurred in <u>Seibert</u>, but rather the officers repeatedly told Gonzalez-Lauzan just to listen. Also, the officers did not have prewarned

---

[8] We recognize that this Court is not bound by a plurality opinion. <u>Horton v. Zant</u>, 941 F.2d 1449, 1464 n.32 (11th Cir. 1991) ("Plurality opinions are only persuasive authority; they are not binding on this Court."); <u>Foster v. Bd. of Sch. Commr's of Mobile</u>, 872 F.2d 1563, 1569 n.8 (11th Cir. 1989) ("A plurality opinion is not binding on this Court, and we are compelled to follow both our prior precedent, as well as prior Supreme Court precedent . . . .") (internal citations omitted). However, because there were four votes for the plurality opinion, we analyze this case under both the plurality's multifactor test and under Justice Kennedy's narrower test.

25

incriminating statements with which to cross-examine Gonzalez-Lauzan in order to pressure him to repeat them and thereby undermine the Miranda warnings. Nor did Gonzalez-Lauzan's postwarning statements relate to the substance of his single, brief prewarning statement. Id. We do not say that Justice Kennedy's test is satisfied, but rather we conclude that his test does not apply to this type of two-step interrogation.

In summary, during their presentation of evidence to Gonzalez-Lauzan, the officers repeatedly informed Gonzalez-Lauzan that he should just listen and that they were not asking him any questions. Because the officers had yet to ask Gonzalez-Lauzan a single question, the Miranda warnings they provided – advising Gonzalez-Lauzan that he need not answer questions – were not inconsistent with the first phase of the interview where they told him just to listen. Nothing in the record suggests that Gonzalez-Lauzan's waiver of his rights was uninformed, coerced or involuntary. We conclude that the midstream Miranda warnings offered by the officers did not fail to offer Gonzalez-Lauzan or a reasonable suspect "a genuine choice whether to follow up on [his] earlier admission." Id. at 616, 124 S.Ct. at 2612 (plurality opinion).

### III. SIXTH AMENDMENT CLAIM

26

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Gonzalez-Lauzan contends that the entire interview by the officers violated his right to counsel because the police knew that he was represented by Raben at the time of the interview.

Although Raben represented Gonzalez-Lauzan concerning his supervised release violation in early 2002, "[t]he Sixth Amendment right . . . is offense specific." McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991). As noted earlier, the magistrate judge made no finding as to whether Raben represented Gonzalez-Lauzan at the time of the interview. It is doubtful that Raben represented Gonzalez-Lauzan at that time, since on the same day Raben was representing Senior, Gonzalez-Lauzan's father and co-defendant, in the Texidor matter.[9]

Regardless, the evidence is undisputed that Gonzalez-Lauzan did not invoke his right to counsel during the entire September 18, 2002 interview. As discussed above, Gonzalez-Lauzan's Miranda waiver was knowing and voluntary. As such, he waived his Sixth Amendment right to counsel and has no independent claim on those grounds. See Patterson v. Illinois, 487 U.S. 285, 296, 108 S. Ct. 2389, 2397

---

[9]See supra note 2.

27

(1988) ("[A]n accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u> has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.") (internal citation omitted).

## IV. CONCLUSION

We conclude that the district court did not err in denying the suppression of Gonzalez-Lauzan's postwarning statements.  Accordingly, we affirm Gonzalez-Lauzan's conviction and sentence.

**AFFIRMED.**