[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11574
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cr-20423-CMA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CEDRIC GRAY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 9, 2019)

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

A federal jury convicted Cedric Gray of carjacking but acquitted him of

brandishing a firearm in furtherance of a crime of violence.  On appeal, Gray raises

three issues: that the district court erred in denying his *Miranda*-based suppression

motion; that the district court erred in admitting evidence of prior convictions; and that the district court erred in applying a six-level sentencing enhancement for use of a firearm. Although we agree that the district court should not have admitted the evidence of Gray's prior convictions, we affirm his conviction and sentence.

## I.

On August 29, 2016, Nelson Gonzalez drove to the bank and left his wife, Maria Montano de Gonzalez, and their one-and-a-half-year-old son, Erasmo, in the car while he went inside. While Nelson was gone, the defendant—Cedric Gray—opened the driver's door, entered the car, pointed a gun at Maria, and ordered her to get out and leave her son behind. Maria tried to grab her son, but in her frantic state she was unable to remove his seat belt. Gray screamed at her, becoming angrier and again ordering her to leave without her child. As Gray threw the car into reverse and quickly backed away, Maria grabbed her son so forcefully that she was afraid she had broken his legs. She ran away with her son in her arms, and Gray drove off with the car. The entire encounter lasted less than a minute.

On September 12, Gray was arrested for an unrelated armed burglary. The police questioned him about that unrelated burglary and also about "a recent carjacking"—the parties dispute whether the "recent carjacking" was the August 29 incident or a separate crime—and Gray invoked his right to remain silent. The questioning stopped and Gray was taken to jail on the armed burglary charge. On

2

December 6, nearly three months later, a different officer mirandized Gray and questioned him about the August 29 carjacking. Gray, after waiving his *Miranda* rights, answered questions and—after signing another consent form—provided a DNA sample.

In June 2017, Gray was charged with carjacking and brandishing a firearm in furtherance of a crime of violence. He pleaded not guilty. Before trial, the district court denied Gray's motion to suppress "statements allegedly made by Mr. Gray on December 6, 2016" and denied his motion *in limine* to exclude evidence of his prior convictions for armed robbery, armed carjacking, and burglary of an automobile. The government ultimately decided not to introduce the December 6 statements, but the jury was shown certified copies of Gray's priors. The jury convicted Gray of carjacking and acquitted him of the firearm offense.

At sentencing, over Gray's objection, the district court applied a six-level enhancement for using a firearm in the course of the carjacking. The court sentenced Gray to 162 months' imprisonment, three years' supervised release, a $100 special assessment, and a $1,000 fine. Gray now appeals, arguing that his suppression motion and motion to exclude his prior convictions should have been granted and that the district court erred in applying the gun enhancement.

II.

"In reviewing a district court's denial of a motion to suppress, this court reviews factual findings for clear error and the application of the law to those facts *de novo*."  *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1132 n.4 (11th Cir. 2006).  A district court's decision to admit evidence under Federal Rule of Evidence 404(b) is reviewed for abuse of discretion.  *United States v. Sterling*, 738 F.3d 228, 234 (11th Cir. 2013).  And in reviewing a sentence, we review the district court's factual findings for clear error and its interpretation and application of the Sentencing Guidelines de novo.  *United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018).

III.

A. *Motion to Suppress*

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To protect that right, the Supreme Court held in *Miranda v. Arizona* that once a defendant "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease" and that "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."  384 U.S. 436, 473–74 (1966).  Gray argues that the government violated his *Miranda* rights when it questioned him on December

4

6, 2016—nearly three months after he had invoked his right to remain silent during a separate interview—and that the district court erred in denying his suppression motion. We disagree.

In *Michigan v. Mosley*, the Supreme Court addressed "under what circumstances, if any, a resumption of questioning" after a defendant has invoked his right to remain silent "is permissible." 423 U.S. 96, 101 (1975). The Court rejected extreme rules in either direction that would "permit the continuation of custodial interrogation after a momentary cessation" or impose "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation," instead charting a middle ground: "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 102–04. Applying that standard, the *Mosley* Court held that admitting the defendant's statements—obtained in a second interview conducted a few hours after the defendant had invoked his rights in a first interview about a different crime, by a different police officer, in a different location—did not violate *Miranda*. *Id.* at 104–05, 107.

Although *Mosley* provided "no clear guidance on the specific circumstances under which questioning may be resumed," we have identified four relevant factors: 1) whether "the initial interrogation ended immediately" upon invocation

5

of the right to remain silent; 2) whether "a substantial amount of time elapsed" before questioning resumed; 3) whether the suspect "was again read his rights" before the second round of questioning; and 4) whether the second round of questioning was done "by a different officer about an unrelated crime." *Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1296–97 (11th Cir. 2007). "We have not held that the absence of a single *Mosley* factor is dispositive," and have instead looked "to the circumstances as a whole." *Id.* at 1298–99. So, for example, a second interview may be permissible under *Mosley* even if it concerns the same crime as the first. *See United States v. Nash*, 910 F.2d 749, 752 (11th Cir. 1990); *United States v. Bosby*, 675 F.2d 1174, 1181–82 (11th Cir. 1982); *see also Gore*, 492 F.3d at 1298–99 (refusing, in habeas context, to say that state court's decision on this point was "objectively unreasonable").[1]

That makes this an easy case, because the "same crime" factor is the only one that cuts in Gray's favor. First, the district court found after a suppression hearing that "[w]hen Defendant invoked his right to silence during the September 12 questioning, the officers stopped the interrogation." Second, a substantial amount of time—nearly three months—passed between the first and second

---

[1] Some of Gray's briefing relies on cases discussing the consequences of a suspect's invocation of his right to *counsel*. But the consequences of invoking the right to counsel differ from those of invoking the right to remain silent, *see, e.g.*, *Bosby*, 675 F.2d at 1181–82, and here Gray invoked only the latter.

interviews. *See Mosley*, 423 U.S. at 104 ("more than two hours"); *Bosby*, 675 F.2d at 1181–82 (two weeks). Third, Gray was given a fresh set of *Miranda* warnings before his December 6 interview. As to the fourth factor—whether "a different officer" asked about "an unrelated crime"—the officers were different but the parties dispute whether the September 12 questions about "a recent carjacking" referred to the August 29 incident or something else. Even assuming Gray is correct on this point, viewing the circumstances as a whole, we conclude that the authorities "scrupulously honored" Gray's "right to cut off questioning." The district court therefore did not err in denying Gray's suppression motion.

## B. Rule 404(b) Evidence

### a. Admissibility

At trial, the jury was shown certified copies of Gray's prior convictions for armed carjacking, armed robbery, and car burglary. Gray argues that those convictions should have been excluded because they were not relevant for any purpose other than to show his character and propensity to commit carjacking, and because they were nearly twenty years old. Even considering the broad discretion that district courts enjoy in this arena, we conclude that the district court erred in admitting evidence of Gray's prior convictions.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in

7

accordance with the character." Fed. R. Evid. 404(b)(1). But this evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). And a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This all leads to a familiar three-part test: for evidence of a prior crime to be admissible, it must 1) "be relevant to an issue other than the defendant's character," 2) be supported by "sufficient proof so that a jury could find that the defendant committed the extrinsic act," and 3) "possess probative value that is not substantially outweighed by its undue prejudice" and "meet the other requirements of Rule 403." *E.g.*, *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (quoting *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc)).

The evidence of Gray's prior convictions fails at the first prong. Before the district court, the government argued that Gray's convictions were relevant "to establish that Defendant's presence in the vehicle was not due to some unfortunate coincidence," in response to an anticipated trial defense theory that Gray's "DNA and fingerprints were found in the stolen vehicle because he acquired the vehicle

after someone else committed the carjacking." The district court admitted the evidence on a lack-of-accident-or-mistake theory.

As an initial matter, the government conflates accident or mistake with coincidence. More fundamentally, though, Gray's prior convictions do nothing to rebut the "unfortunate coincidence" theory—except insofar as they invite the jury to engage in propensity reasoning. Using prior bad acts to show lack of accident or mistake makes sense in cases where the alleged conduct could occur unwittingly. *See, e.g.*, *United States v. Kapordelis*, 569 F.3d 1291, 1313 (11th Cir. 2009) (allowing evidence of defendant's prior sexual behavior to rebut claim that download of child pornography "happened automatically"). But this is not, say, a tax fraud case, where a defendant might claim ignorance of an obscure provision of the tax code, or a securities case, where a company might inadvertently omit certain information from its 10-K; rather, Gray was charged with carjacking and brandishing a firearm in the process. It is hard to imagine how a person could commit those acts by accident or mistake. And even if it were possible to accidentally commit armed carjacking, Gray's prior convictions do nothing to rebut that possibility. They were relevant only to invite precisely the sort of propensity reasoning that Rule 404(b) forbids: that Gray probably carjacked this

9

car because he is the sort of person who does that kind of thing.  The district court should have excluded this evidence.[2]

### b.  Harmlessness

We conclude, however, that the error in admitting evidence of Gray's past convictions was harmless.  "An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights," and we will affirm where "the error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."  *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999) (internal alteration, quotation marks, and citations omitted).  "An error may substantially influence an outcome and thus warrant reversal even if the evidence, had no error occurred, would have been sufficient to support the conviction."  *Id.*  Even so, overwhelming evidence of guilt cuts in favor of a harmlessness finding, and we look at the record as a whole.  *See United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010).

---

[2] On appeal, the government argues that Gray's prior convictions were also relevant to show knowledge and intent.  But the district court's limiting instruction at trial and the jury instructions mentioned only the accident-or-mistake purpose, telling the members of the jury that they "must not consider this evidence to decide if the Defendant engaged in the activity alleged in the indictment" but "may consider this evidence to decide whether the Defendant committed the acts charged in the indictment by accident or mistake."  Because we "assume that the jury properly followed the court's instructions," we "need consider only whether the evidence of prior convictions here was properly admitted for the limited purposes stated in the jury instructions." *Sterling*, 738 F.3d at 237–38.

10

Here, the government presented eyewitness testimony and physical evidence of Gray's guilt. Gray's counsel herself argued before the district court that "[t]he Government's case is strong." And for good reason: the victim saw Gray's face up close and provided a description the day of the incident, picked Gray out of a photo lineup, and identified Gray at trial. Moreover, Gray's fingerprints and DNA were present in the car when it was found abandoned ten days after the crime. Viewing the record as a whole, the admission of Gray's prior convictions did not substantially influence the outcome of the trial.

## C. Sentencing Enhancement

The Sentencing Guidelines provide for a six-level enhancement if "a firearm was otherwise used" during a carjacking. U.S.S.G. § 2B3.1(b)(2)(B). The jury acquitted Gray of the gun charge, but at sentencing the district court found that the evidence supported applying § 2B3.1(b)(2)(B)'s six-level enhancement. *See United States v. Faust*, 456 F.3d 1342, 1347 (11th Cir. 2006) (acquitted conduct may be considered at sentencing if proved by a preponderance of the evidence). On appeal, Gray raises two arguments: that he did not "otherwise use" the gun, and that the government did not prove that the gun was real. We do not find either argument persuasive.

Gray contends that the evidence does not demonstrate that he "otherwise used" the gun and that "[a]t most, the evidence showed that the object was

11

'brandished.'"  But the Sentencing Guidelines and our caselaw refute that argument.  The relevant guideline distinguishes between cases where "a firearm was discharged" (seven-level enhancement), where "a firearm was otherwise used" (six levels), and where "a firearm was brandished or possessed" (five levels).  U.S.S.G. § 2B3.1(b)(2).  A firearm is "brandished" if "all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person."  U.S.S.G. § 1B1.1 cmt. n.1(C).  A firearm is "otherwise used" if the "conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon."  *Id.* cmt. n.1(I).  So "otherwise used" is the realm between firing a gun and making a gun known in order to intimidate someone.

Here, Gray pointed the gun at Maria Gonzalez and ordered her to exit the car and leave her son behind.  Gonzalez testified that Gray did this repeatedly as she failed to comply with his demand, and that she believed he would shoot her.  Pointing the gun at Gonzalez while shouting orders was "more than" simply displaying or making known the weapon's presence to intimidate; indeed, it is hard to see what more Gray could have done with the weapon short of firing it.  We have said that "the 'otherwise use[]' of a firearm includes the use of the firearm to make an explicit or implicit threat against a specific person."  *United States v.*

*Johnson*, 803 F.3d 610, 616 (11th Cir. 2015). More to the point, we have repeatedly held that a defendant "otherwise used" a gun where he pointed it at someone to coerce or threaten that person. *See, e.g.*, *id.* at 617 (bank robber "pointed the pistol at the tellers and demanded money without dye packs"); *United States v. Wooden*, 169 F.3d 674, 676 (11th Cir. 1999) (carjacker "pointed the handgun at a specific victim, holding the gun one-half inch from the victim's forehead"). Gray's conduct here fits the bill.

Gray's second argument—that the government failed to prove that the gun was real—is a closer call. The Sentencing Guidelines make clear that items such as BB guns and items that closely resemble a real gun qualify as "dangerous weapons" but not as "firearms." *See* U.S.S.G. § 1B1.1 cmt. n.1(D); *id.* cmt. n.1(G). And if Gray had "otherwise used" a "dangerous weapon" instead of a "firearm," he would have received a four-level rather than a six-level enhancement. *See id.* § 2B3.1(b)(2). The district court concluded that there was enough evidence to find that Gray used a real gun based on "what it appeared to be to the victim, a gun." Given the relevant standards—preponderance of the evidence for the district court, and clear error for us—we affirm.

The victim, Maria Gonzalez, testified that Gray "pulled out a weapon" and pointed it at her. She described the weapon as a black pistol that "look[ed] real" to her, although she did not know what type. On cross, Gonzalez admitted that she

"never held the gun," "never saw the carjacker put any bullets in it," "never saw him put a magazine in it," did not know whether the gun was loaded, did not know what brand of gun it was, did not know the caliber, and did not know whether the gun could actually fire. When asked "[y]ou don't know if the gun was real," Gonzalez replied: "No. I saw a pistol in his hand. I cannot say anything more." On redirect, Gonzalez testified that she had seen a gun before the day of the incident, that the gun did not look like it was made of plastic, that the gun did not look like a toy, that the gun did not look fake, and that the gun scared her because she thought Gray was going to shoot her.

In light of that testimony, we cannot say that the district court clearly erred in determining that the gun in this case was real. First, prior cases suggest that— even in the beyond-a-reasonable-doubt context—the lay nature of witness testimony on this issue is not disqualifying. *See United States v. Woodruff*, 296 F.3d 1041, 1049 (11th Cir. 2002).[3] Second, "[w]here a fact pattern gives rise to two reasonable and different constructions, the factfinder's choice between them cannot be clearly erroneous." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012) (internal quotation marks and citation omitted). It is of course

---

[3] Gray points out that in the past when we have upheld the sufficiency of the evidence to prove *beyond a reasonable doubt* that a gun was real, the government adduced substantially more proof than it did here. *See United States v. King*, 751 F.3d 1268, 1274–75 (11th Cir. 2014) (seven eyewitnesses, surveillance footage, and still photographs); *see also Woodruff*, 296 F.3d at 1049 (three eyewitnesses and still photographs). But that point is not particularly illuminating, both because the standard of proof was different and because neither case set any evidentiary floor.

14

possible that Gonzalez was mistaken, but it is also reasonable to conclude that she was not. Third, the district court's decision is backed by "reliable and specific evidence." *Id.* Gonzalez saw the gun up close and testified about its color, that it looked real to her, and that it did not appear to be plastic or a toy. The fact that she could not provide details on cross about its caliber or brand does not compel a determination that she was wrong.

On this record, we cannot say that the district court's acceptance of the victim's testimony leaves us with "a definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks and citation omitted). There was therefore no clear error.

*      *      *

Gray's conviction and sentence are **AFFIRMED.**