Timothy HAIRSTON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 00–CF–1045, 03–CO–417.

District of Columbia Court of Appeals.

Argued Nov. 3, 2004.

Decided Aug. 17, 2006.

Peter B. Rutledge and Juliana Mirabilio, appointed by the court; with whom Seth P. Waxman and Alicia Hunt, Washington, were on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Elizabeth Trosman, Roy W. McLeese III, Anjali Chaturvedi, Carolyn K. Kolben, and Suzanne Grealy Curt, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, Associate Judge, and WAGNER and SCHWELB, Senior Judges.*

REID, Associate Judge:

A jury convicted Timothy Hairston, the appellant, of conspiracy to assault and murder members of a rival neighborhood faction of young men, in violation of D.C.Code §§ 22–105a, –501, –2401 (1996); [1] first-degree murder while armed (of Arrion Johnson), in violation of § 22–2401 (recodified at § 22–2101); possession of a firearm during a crime of violence or dangerous offense (related to the first-degree murder of Arrion Johnson), in violation of D.C.Code § 22–3204(b) (recodified at § 22–4504(b)); assault with intent to kill (Luis Delarosa) while armed, in violation of D.C.Code §§ 22–501, –3202 (recodified at §§ 22–401, –4502); possession of a firearm during a crime of violence or dangerous offense (related to the assault with intent to kill of Luis Delarosa), in violation of D.C.Code § 22–3204(b) (recodified at § 22–4504(b)); and carrying a pistol without a license, in violation of D.C.Code

---

* Judge Wagner was Chief Judge of the court at the time of argument. Her status changed to Senior Judge on December 21, 2005.

Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

1. Recodified at D.C.Code §§ 22–1805a, –401, –2101 (2001).

§ 22–3204(a) (recodified at § 22–4504(a)).[2] Subsequently, he filed a *pro se* pleading, which the trial court treated as a motion to vacate sentence under D.C.Code § 23–110 on the ground of ineffective assistance of counsel. The trial court denied his motion.

Mr. Hairston filed a timely direct appeal, and a timely collateral appeal. He claims that the trial court erred by not (1) suppressing his confession based on a violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) holding an evidentiary hearing on his ineffective assistance of counsel claim; (3) granting his motion for judgment of acquittal on the basis of insufficiency of evidence with respect to the conspiracy charge; and (4) finding that he suffered substantial prejudice due to improper comments by the prosecutor during closing and rebuttal arguments. We affirm.

## FACTUAL SUMMARY

The record shows that the charges against Mr. Hairston, and others with whom he was indicted and tried,[3] resulted from an intense neighborhood dispute between young men in the Clifton Terrace area (the Northwest quadrant of the District of Columbia) during the months of April through October 1997. The dispute between the young men belonging to the "1300 Clifton" and the "1400 Clifton" rival factions escalated into violence, resulting in several deaths and injuries, including the murder of Arrion Johnson, and the injury of Luis Delarosa.

## ANALYSIS

### The Motion to Suppress Confession

Mr. Hairston contends in his main brief that his written statement should have been suppressed because his Fifth Amendment constitutional rights were violated. Specifically, he complains that the police "deliberately withheld [his] *Miranda* rights"; that "[i]nstead of providing *Miranda* rights prior to their custodial interrogation, police officers tried to exact an incriminating statement from [Mr.] Hairston by confronting him with evidence and questioning him for at least an hour." He maintains that, based on this conduct, the trial court should have suppressed his statement. The government insists in its main brief that Mr. Hairston "voluntarily confessed his role in [Mr.] Johnson's murder *after* signing a Form PD–47 waiving his *Miranda* rights," and that, at any rate, he "made a knowing, voluntary, and intelligent waiver [of his *Miranda* rights] under the totality of the circumstances." (Emphasis in original).

We asked the parties to file supplemental briefs after the Supreme Court handed down its decision in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). In his supplemental brief, Mr. Hairston argues that "[b]ecause this case ... involves a confession obtained through question-first police tactics designed to sap the *Miranda* warnings of their protective value, this [c]ourt should reverse the [trial court's] judgment ...." He claims that he "was subjected to a brutal series of 'psychological ploys' designed precisely to break his will so that the *Miranda* warn-

---

**2.** The jury based all of the non-conspiracy convictions on substantive liability (principal, joint principal, or aiding and abetting), rather than conspiracy liability. Mr. Hairston was found not guilty of several other offenses. He was sentenced to an aggregate prison term of 45 years to life.

**3.** Mr. Hairston's co-defendants, Jose Blunt and Donald Bullock, were found not guilty on all counts of the indictment.

ings, when finally given, were an empty gesture." The government contends that *Seibert* "was based on an entirely different set of circumstances," and that "an essential factor upon which *Seibert* is based— the existence of an unwarned confession . . . is not present here."

### Factual Background

Before discussing the parties' arguments, we set forth the pertinent factual context. The government presented evidence showing that on August 22, 1997, Metropolitan Police Department ("MPD") Detective Michael C. Irving obtained an arrest warrant for Mr. Hairston, then an eighteen year-old male, relating to the murder of Mr. Johnson. After obtaining the warrant, Detective Irving advised the officers and detectives in the Third District of the MPD[4] "that if they saw [Mr. Hairston, they should] place him under arrest and not to advise him of his rights." Detective Irving delivered this instruction to the other offices because he "wanted to be the one to speak with [Mr. Hairston] when he was arrested."

On September 26, 1997, at approximately 10:00 p.m., Mr. Hairston was arrested in the Third District. Detective Irving was informed that Mr. Hairston had been arrested and "was being transported to the Homicide Branch of the [MPD]," by Sergeant Kirk Sloan of the Gun Recovery Unit. Upon learning of the arrest, Detective Irving instructed Sergeant Sloan to "place [Mr. Hairston] in the interview room and to leave him alone and [that he, Detective Irving,] would be there shortly thereafter."

Detective Irving arrived at the Homicide Branch at approximately 11:00 p.m. or 11:30 p.m. He found Mr. Hairston "in the interview room located on the third floor" of the building, sitting at a table, alone in a small room.[5] He was handcuffed to a chain that was attached to the floor. According to Detective Irving, Mr. Hairston was "quiet," was not "injured," was not in any "physical discomfort," did not exhibit any "emotional distress," and "appeared to be okay." Mr. Hairston had been restrained in this room from the time he was arrested and transported to the Homicide Branch, until the time of Detective Irving's arrival, that is, for approximately one and a half to two hours (10:00 p.m. to 11:30 p.m.–12:00 a.m.). He had not been given *Miranda* warnings before Detective Irving arrived.

When Detective Irving entered the room, he sat down at the table across from Mr. Hairston and introduced himself. Detective Irving "advised [Mr. Hairston] that he had been placed under arrest for murder and that [the detective] was interested in hearing his side of the story as to what happened on the day [Mr.] Johnson was killed.".[6] Detective Irving began to outline "some of the facts in the case that [he] was aware of as far as [Mr. Hairston's] participation." He "knew that [Mr. Hairston] was in a van that drove from the 1300 block of Clifton [Street] into [the scene of the murder] at the time [Mr.] Johnson was shot and killed." Mr. Hairston did not ask to speak with an attorney at any point during this conversation.

---

**4.** Detective Irving worked in the Fifth District; he contacted members of the Third District because he believed that Mr. Hairston would eventually be apprehended in that district.

**5.** The room's dimensions were approximately 8 by 10 or 10 by 12.

**6.** At some point during the questioning, Detective Eugene Lonon, Detective Irving's partner, entered the room. Detective Irving, however, appears to have done all the questioning.

As this one-sided conversation unfolded, Detective Irving did not immediately advise Mr. Hairston of his *Miranda* rights.[7] Rather, he described some of the details of Mr. Johnson's death—the van that was used in the killing; and the names of some of the people who were also involved in the murder. Detective Irving told Mr. Hairston that he "just wanted him to listen," because his stated goal at this stage of the interview was to make sure that Mr. Hairston was "aware of some of the facts," and "if [Mr. Hairston] did attempt to speak . . . [, Detective Irving planned to] emphasize that [he] wanted [Mr. Hairston] to listen and not talk at that time."

While recounting the facts of the murder to Mr. Hairston, Detective Irving mentioned that he had already spoken with Am[o]s Chaney, another suspect in the case, that Mr. Chaney "had already been placed under arrest," and that "Mr. Chaney had already given [Detective Irving] a statement."[8] When Mr. Hairston told the Detective that he did not believe that Mr. Chaney had given the police a statement, Detective Irving "ask[ed] him . . . [if] he want[ed] to see the proof" of the statement. Mr. Hairston "said that he wanted to see the proof."

In response to Mr. Hairston's request "to see the proof," Detective Irving left the interview room and set up a videotape machine in another room. He placed a "videotape in the machine"—a recording of his interview of Mr. Chaney—and "turned

7. When asked during the suppression hearing and at trial why he had not given Mr. Hairston his *Miranda* warnings, he gave several responses, as illustrated by the following excerpts from the suppression hearing and trial transcripts:

> **Q:** Well, sir, at the time that you told [the Third District] not to advise Mr. Hairston of his rights, you knew that you wanted to speak to him about [the murder of Mr. Johnson], didn't you?
> **A:** That's correct.
> **Q:** And, indeed, the reason you told them not to advise him of his rights is because you wanted to speak to him, correct?
> **A:** That's correct.
> **Q:** So you didn't want to run the risk of Hairston invoking his right to remain silent or his right not to speak in the absence of counsel, correct?
> **A:** Correct.
> **Q:** Now, to go back, you indicated to [co-counsel] that after you obtained a warrant for Mr. Hairston that you instructed any police officers who arrested him not to read him his rights; correct?
> **A:** That's correct.
> **Q:** Knowing full well that at some point he was going to be advised of his rights; correct?
> **A:** Correct.
> **Q:** And what you were doing, among other things, was you didn't want to run the

> risk of Mr. Hairston exercising his rights; correct?
> **A:** No, that's not correct.
> **Q:** And, indeed, the reason you told them not to advise him of his rights is because you wanted to speak to him, correct?
> **Q:** Well, sir, you wanted to get in there and talk to him without him having his rights being read to him so you could get whatever information you could get out of him; correct?
> **A:** That's correct.
> **Q:** Could you have read [Mr. Hairston] his rights earlier than you did?
> **A:** I could have.
> **Q:** Why didn't you?
> **A:** No reason, I wanted him to understand that I was—had a lot of knowledge about the case, and that if he wanted to help himself, that he should tell me what happened, and I told him that it was two sides to every story, and I may not have had the whole story.
> . . . .
> **Q:** Why didn't you let him call his mom before you read him his rights?
> **A:** I didn't let him do anything prior to him being read his rights. I didn't want him to call and speak with someone else and they tell him what to do or what to say.

8. Mr. Chaney entered guilty pleas to certain charges and testified against Mr. Hairston and his co-defendants.

the volume down." He then "returned to the interview room, [] got Mr. Hairston,[]brought him back into the room with the video monitor," and turned on the videotape recorder so that Mr. Hairston could see Detective Irving "speaking with Mr. Chaney." The detective never turned up the volume so that Mr. Hairston could "hear the contents of the tape." Mr. Hairston watched the video for "a little under a minute" so that he could see that "Mr. Chaney was, in fact, in custody when he spoke to [Detective Irving]." Detective Irving readily acknowledged on cross-examination that his purpose in showing the videotape to Mr. Hairston was "to convince him of the strength of [his] case so that [Mr. Hairston] would fully cooperate."

Detective Irving returned to the interview room with Mr. Hairston and "asked him again did he want any help in his case, and . . . did he want to tell [Detective Irving] his side of the story . . ." Approximately ten minutes after viewing the image of Mr. Chaney speaking with Detective Irving, Mr. Hairston said "yes." [9] Detective Irving then administered the *Miranda* warnings. As Detective Irving testified: "I advised him that I had to— before he told me his side of the story that I had to advise him of his rights." Detective Irving took the PD–47 card out of his shirt pocket, read Mr. Hairston his rights as they appeared on the card, and "advised [him] that he had to answer the first four questions and sign his name on line number five" of the card. The rights listed on the card included, among others, the right to remain silent and the right to

talk with a lawyer. At 12:51 a.m., after being with Detective Irving for approximately one hour, Mr. Hairston answered yes to each question on the card. Mr. Hairston also put his initials, T.H., next to each question and signed "line number five."

After Mr. Hairston signed the waiver card, "the interview again started up," and Mr. Hairston proceeded to implicate himself in the murder of Mr. Johnson. When Detective Irving asked Mr. Hairston questions regarding his involvement in the murder, he initially gave "very vague" answers, and attempted to provide a very limited confession.[10] However, Detective Irving questioned Mr. Hairston for "roughly an hour" and was able to elicit a detailed account of Mr. Hairston's involvement in the murder. Although Mr. Hairston refused to allow his statement to be videotaped, he agreed to "provide a typewritten statement," and eventually signed a five-page statement prepared by Detective Irving. The interview ended at 3:18 a.m.

The trial court denied Mr. Hairston's motion to suppress his statement. The court determined that Mr. Hairston was "in custody," but made his incriminating statement after "he executed a PD–47 at 12:51 a.m." In addition, the court found no dispute that Detective Irving "engaged in an informational discussion with Mr. Hairston in which he attempted to advise Mr. Hairston of much of the information that he had obtained and was aware of related to the shooting . . . of [Mr.] Johnson." This informational discussion was not the

9. Defense counsel inquired about the impact of the videotape on Mr. Hairston:

Q (**Defense Counsel**): And after you showed him the tape, would it be fair to say there was a change in his level of being forthright with you?
A (**Detective Irving**): No doubt about it.

Q: And from that point forward he gave you some information; isn't that correct?
A: That's correct.

10. Detective Irving did not take any notes during this stage of the interview, because he did not want "to break [Mr. Hairston's] concentration."

functional equivalent of interrogation, and there were no indicia of coercion, under the circumstances. As the trial court stated:

> The Court cannot find that the detective's actions were really analogous to the type of conduct that the court has found unconstitutional in cases like *Rhode Island* [*v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ] or *Arizona v. [Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).]
>
> I cannot find that it was a staged comment in order to elicit the statements of incrimination from Mr. Hairston. Nor can I find there are indicia of coercion, although he had been arrested about two and [one] half hours before he executed the PD 47. I cannot find that there is anything to show that his will was overborne by this [wait] before Detective Irving began talking to him.
>
> And noticeably it was only 30 minutes after the detective arrived and began talking to Mr. Hairston that he signed the PD 47. This was not Mr. Hairston's first interaction with the police and he was not under age or particularly vulnerable or in any other way [an] impaired person in terms of understanding his rights[,][a]nd having the ability to decline to participate in giving the statement. . . .
>
> There were, according to the record evidence which we have, limited of course to Detective Irving's statements and testimony [,] no threats or promises made to exact the statement, no tricks likely to produce any kind of untrue statement.

### Applicable Legal Principles

■ We turn now to the legal principles which will guide our discussion. "In reviewing the trial judge's denial of a motion to suppress statements on *Miranda* grounds, we defer to [the court's] findings of evidentiary fact," *Jones v. United States,* 779 A.2d 277, 281 (D.C.2001) (citing *In re E.A.H.,* 612 A.2d 836, 838 (D.C. 1992)); that is, "[w]e review findings of historical fact only for clear error, and give due weight to inferences drawn from those facts by resident judges." *Id.* (quoting *United States v. Guiterrez,* 92 F.3d 468, 471 (7th Cir.1996)). "We 'view the evidence presented at the suppression hearing in the light most favorable to the [prevailing] party . . . and we draw all reasonable inferences in that party's favor.' " *Mitchell v. United States,* 746 A.2d 877, 881 (D.C.2000) (internal quotation marks and other citation omitted) (quoting *Womack v. United States,* 673 A.2d 603, 607 (D.C.1996)).

■ "But in this type of case, as in any other, this court must 'determine the ultimate question of law *de novo.*' " *Jones, supra,* 779 A.2d at 281 (quoting *In re E.A.H.,* 612 A.2d 836, 838 (D.C.1992)). "Whether, on the duly established facts, [the appellant] was subjected to custodial interrogation without the benefit of *Miranda* warnings is a question of law." *Id.* 779 A.2d at 281 (quoting *Reid v. United States,* 581 A.2d 359, 363 (D.C.1990)). "More particularly, 'the question whether [the appellant's] rights were scrupulously honored, including whether police conduct constitutes interrogation, is a question of law.' " *Id.* (quoting *Stewart v. United States,* 668 A.2d 857, 863 (D.C.1995)). "Our role is to ensure that the trial court had substantial basis for concluding that no [constitutional] violation occurred." *Resper v. United States,* 793 A.2d 450, 456 (D.C.2002) (quoting *McIntyre v. United States,* 634 A.2d 940, 943 (D.C.1993)).

■ Under *Miranda,* "[t]he government is constitutionally precluded by the Fifth Amendment's Self–Incrimination Clause from using at trial a defendant's

incriminating statement made while in custody unless the defendant has been advised of his right to remain silent (as a means of safeguarding the privilege against compulsory self-incrimination) and to be represented by an attorney before he is interrogated." *Hill v. United States,* 858 A.2d 435, 441 (D.C.2004) (citing *Miranda, supra,* 384 U.S. at 442, 86 S.Ct. 1602; *Dickerson v. United States,* 530 U.S. 428, 442, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). *See also Resper, supra,* 793 A.2d at 455 ("[A] suspect must be given certain warnings prior to custodial interrogation so as to preserve his Fifth Amendment right against self-incrimination.") (referencing *Miranda* and *Dickerson, supra*). Thus, "[t]he *Miranda* rule has become an important and accepted element of the criminal justice system." *Missouri v. Seibert,* 542 U.S. 600, 618, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (Kennedy, J., concurring in the judgment) (citing *Dickerson, supra,* 530 U.S. at 428, 120 S.Ct. 2326). "At the same time, not every violation of the rule requires suppression of the evidence obtained. Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Id.* at 618–19, 124 S.Ct. 2601. Furthermore,

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these

circumstances solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). And, "prewarning interaction [between a defendant and the police] [does] not render the *Miranda* warnings ineffective to a reasonable suspect, [where a defendant's] waiver of his *Miranda* rights was voluntary and constitutionally valid," and thus, the defendant's "warned statements are admissible under both *Elstad* and *Seibert.*" *United States v. Gonzalez–Lauzan,* 437 F.3d 1128, 1137, 1139 (11th Cir.2006). Nevertheless, if the defendant's "statement was the coerced product of the functional equivalent of express questioning, ... it should ... [be] suppressed [where] it was made in the absence of *Miranda* warnings." *Hill, supra,* 858 A.2d at 447.

■■■ If this court detects "a *Miranda* violation, [it] must [] determine whether the trial court's denial of the motion to suppress the statement constitutes reversible constitutional error." *Id.* (citing *Stewart v. United States,* 668 A.2d 857, 868 (D.C.1995) (applying *Chapman v. California,* 386 U.S. 18, 20, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). "If there is 'no reasonable possibility' that the offending evidence might have contributed to the conviction, the error is harmless beyond a reasonable doubt." *Id.* (citing *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. 824); *see also Smith v. United States,* 529 A.2d 312, 318 (D.C.1987) (citing *Derrington v. United States,* 488 A.2d 1314, 1331 & n. 25 (D.C.1985)).

Mr. Hairston's case falls somewhere within the interstices of the factual context and legal principles articulated in *Seibert, Elstad, Hill,* and *Gonzalez–Lauzan, supra.*[11] The factual contexts of *Seibert* and

---

11. Mr. Hairston suggests that the case of

*United States v. Aguilar,* 384 F.3d 520 (8th

*Elstad* are different from the factual scenario in the case before us, but are helpful in determining whether what transpired before Mr. Hairston was given his *Miranda* warnings constituted the functional equivalent of interrogation. In *Seibert*, a plurality of the Supreme Court held that the police interrogation practice commonly referred to as "question-first" violated the principles of *Miranda*, and was therefore unconstitutional. There, the respondent's infant son who was afflicted with cerebral palsy, died in his sleep. Fearing that she would be charged with neglect for her son's death, because he had bedsores on his body, the respondent concocted a plan to conceal the real cause of his death. The respondent, with the help of her two sons and their friends, set the family mobile home on fire, with hopes that the ensuing fire would destroy all evidence of the boy's death. However, to avoid any appearance that her son had been left at home unattended, the respondent decided that someone else should also be left in the burning mobile home. The respondent chose Donald Rector, an unrelated mentally-ill eighteen year-old who was living with the family at the time. The mobile home was set on fire with the body of her infant son still inside, and Mr. Rector sound asleep. He was killed by the fire. *Seibert, supra*, 542 U.S. at 604, 124 S.Ct. 2601.

Five days after the fire, the police arrested the respondent but did not immediately read her her *Miranda* rights. At the police station, Officer Hanrahan questioned the respondent for 30 to 40 minutes,[12] and obtained a confession that the respondent intended Mr. Rector to die in the fire. Officer Hanrahan then gave her a twenty-minute cigarette break, returned and read the respondent her *Miranda* rights, and obtained a signed waiver of her rights. The officer resumed questioning, confronting the respondent with her pre-warning statements,[13] and was able to get the respondent to again confess to Mr. Rector's death. *Id.* at 604–05, 124 S.Ct. 2601.

At the suppression hearing in the *Seibert* case, Officer Hanrahan testified that he made a "conscious decision" to withhold *Miranda* warnings, and that it was part of police interrogation strategy known as "question first." Under this strategy, the police question the suspect without the benefit of a *Miranda* warning and obtain a confession, then give the *Miranda* warnings, and ask the suspect to repeat the confession. *Id.* at 605–06, 124 S.Ct. 2601. The trial court suppressed the pre-warning statement but admitted the responses that were given after the *Miranda* warnings were administered. *Id.* at 606, 124 S.Ct. 2601.

Cir.2004), in which the court affirmed a judgment of the District Court suppressing the defendant's confession, is controlling. The factual circumstances of that case are quite different from those of the instant case. There the suspect was interrogated for approximately one and one-half hours prior to receiving the *Miranda* warnings. During the first phase interrogation, the police officer who conducted the interview "became angry, kicked his desk, and swore at" the suspect "when [he] did not respond in a manner anticipated by" the officer, and the magistrate judge who conducted the suppression hearing, found "that the defendant's post-*Miranda*

warning statement was the result of coercion and that the acts of the police were intentional." *Id.* at 522, 525, 86 S.Ct. 1602.

**12.** During the interrogation, Officer Hanrahan squeezed the respondent's arm, repeating "Donald was also to die in his sleep." *Id.* at 605, 124 S.Ct. 2601.

**13.** The officer recorded the second part of the interrogation. He resumed the second half stating: "Ok, [respondent], we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" *Id.* at 605, 124 S.Ct. 2601.

On appeal, the Supreme Court described the conflicting goals of *Miranda* and the "question first" tactic: Whereas "*Miranda* addressed interrogation practices ... likely ... to disable [an individual] from making a free and rational choice about speaking, and held that a suspect must be adequately and effectively advised of the choice the Constitution guarantees," the "object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 124 S.Ct. 2601 (quoting *Miranda, supra,* 384 U.S. at 464–65, 467, 86 S.Ct. 1602) (citations and internal quotation marks omitted).

To help guide future courts examining similar interrogation techniques, especially in light of *Elstad, supra,* the plurality outlined a multi-factor test "that bear[s] on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object[ive] ..." *Id.* at 615, 124 S.Ct. 2601. A court is to consider: (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and the second," (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.*

The plurality then went on, after stating the above multi-factor test, to analyze whether the respondent had effectively

been denied her rights under *Miranda.* The Court concluded that she had, noting that the "unwarned interrogation ... questioning was systematic, exhaustive, and managed with psychological skill," that when "the police were finished there was little, if anything, of incriminating potential left unsaid," that "the police did not advise [her] that her prior statement could not be used," and, finally, that it "would have been reasonable to regard the two sessions as parts of a continuum." *Id.* at 616–17, 124 S.Ct. 2601. The plurality concluded that "[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." [14] *Id.* at 617, 124 S.Ct. 2601.

In *Elstad,* after the burglary of the home of Mr. and Mrs. Gilbert Gross, the police received information that Michael Elstad, who lived in the neighborhood, might have been involved in the burglary. Armed with an arrest warrant, the police went to Mr. Elstad's home. Mr. Elstad's mother admitted the police and led them to her eighteen-year-old son's bedroom. Later, one of the officers spoke with Mr. Elstad in the living room of his home. When asked whether "he knew a person by the name of Gross," Mr. Elstad "said yes, he did, and also added that he heard that there was a robbery at the Gross house." The officer indicated that he "felt [Mr. Elstad] was involved" in the burglary.

14. Justice Kennedy, concurring in the plurality's judgment, wrote a separate opinion arguing that the plurality's test "cuts too broadly." *Id.* at 622, 124 S.Ct. 2601. Justice Kennedy suggested that the "admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.* In those circumstances, where "the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* "Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.*

Mr. Elstad responded, "Yes, I was there." As Mr. Elstad was in the process of being taken to the Sheriff's office, his father arrived, "opened the rear door of the [patrol] car and admonished his son: 'I told you that you were going to get into trouble, You wouldn't listen to me. You never learn.'" *Elstad, supra,* 470 U.S. at 300–01, 105 S.Ct. 1285. Approximately one hour after his arrival at the Sheriff's office, Mr. Elstad was read his *Miranda* rights. He waived these rights and then gave an incriminating statement to the officers. *Id.* at 301–02, 105 S.Ct. 1285.

The trial court in *Elstad* excluded the statement Mr. Elstad made at his home, "I was there," on the ground that Mr. Elstad "had not been advised of his *Miranda* rights," but admitted the written confession he made at the Sheriff's office, after he had been given and had waived his *Miranda* rights. *Id.* at 302, 105 S.Ct. 1285. The Supreme Court held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. 1285. In reaching its holding, the Supreme Court declared:

> When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. The Court has carefully adhered to this principle, permitting a narrow exception only where pressing public safety concerns demanded. *See New York v. Quarles,* 467 U.S. [649,] 655–656, 104 S.Ct. 2626, 81 L.Ed.2d 550 [ (1984) ]. The Court today in no way retreats from the bright line rule of *Miranda.* We do not imply that good faith excuses a failure to administer *Miranda* warnings; nor do we con-

done inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him. A handful of courts have, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary. Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary.

*Id.* at 317–18, 105 S.Ct. 1285 (footnote omitted). The Supreme Court continued:

> The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver.

*Id.* at 318, 105 S.Ct. 1285.

The facts of both *Hill* and *Gonzalez–Lauzan, supra,* resemble those of Mr. Hairston's case, in some but not all re-

spects. The appellant in *Hill* was arrested in connection with a fatal shooting. He was taken to a police station, placed in an interview room, and handcuffed to a chair. A detective issued instructions that no one should advise the appellant of his rights until the detective had done so. "[A]pproximately three and one-half hours after [he] had been taken into custody," that is, around 11:30 p.m., the detective obtained a soda for the appellant, and then informed him: "I'm Lu Rivera, I'm the one running the show and you're going to be charged with murder II." *Hill, supra,* 858 A.2d at 439–40. When the appellant asked about his friend, and whether he was "locked up," the detective said, "no, but let me tell you he told us what happened"; the appellant replied: "no, I'm going to tell you what happened." *Id.* at 440. He then made a two-minute statement, indicating that he had been driving a vehicle, was trying to park when he had an argument with someone who opened the door to his vehicle. When he exited his vehicle and approached the man who had opened the car door, he saw the man reach for "something shiny, something silver in his waistband." He shot the man, parked his car, and proceeded into an apartment building. *Id.* The detective gave the *Miranda* warnings to the appellant around 1:30 a.m., after he had made his incriminating statement, and the appellant invoked his right to an attorney. *Id.* "The trial court denied the motion to suppress appellant's statement to the police, concluding that Detective Rivera's comments did not constitute the functional equivalent of express questioning." *Id.*

We reversed Mr. Hill's conviction after concluding that his "statement was the coerced product of the functional equivalent of express questioning and, therefore, should have been suppressed because it was made in the absence of *Miranda* warnings." *Id.* at 441, 86 S.Ct 1602. Explaining our conclusion, we said:

> We are convinced that "the seemingly benign transmittal of information to [appellant] ... resembles the kind of mental games that largely generated the *Miranda* decision itself." [*United States v.*] *Brown,* 737 A.2d [1016,] 1021[ (D.C.1999) ] (citing [*Rhode Island v.*] *Innis,* 446 U.S. [291,] 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 [ (1980) ]). The detective's instruction that "nobody [is] to advise him of his rights until I do" underscores the plan to intimidate appellant by purposely withholding the advisement of rights meant to counteract the pressure inherent in custodial interrogation required by the Supreme Court in *Miranda.* This is not to be countenanced for, as the Supreme Court has recently emphasized in an analogous context, "strategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson* held Congress could not do by statute." [] *Seibert,* [*supra,* 542 U.S. at 617, 124 S.Ct. at 2613].

*Id.* at 447, 86 S.Ct. 1602.[15]

Three police officers assigned to interview the appellant in *Gonzalez–Lauzan* adopted a "just listen" technique, as did Detective Irving in Mr. Hairston's case. *Gonzalez–Lauzan, supra,* 437 F.3d at 1139. At the time Mr. Gonzalez–Lauzan was interviewed, he was serving a sentence for violation of supervised release in connection with a prior offense, and had been indicted but not then arrested on a

---

**15.** The Supreme Court in *Seibert* referred to specific police "training programs [which] advise officers to omit *Miranda* warnings altogether or to continue questioning after the suspect invokes his rights." *Seibert, supra,* 542 U.S. at 610 n. 2, 124 S.Ct. 2601 (citations omitted).

murder charge. *Id.* at 1130. The officers removed him from a federal detention center, took him to an interview room at a courthouse, and spoke with him for two and one-half to three hours, revealing to him evidence that they had gathered concerning the murder. *Id.* at 1130–31. Similar to Detective Irving's purpose in using the "just listen" technique, the three officers in the *Gonzalez–Lauzan* case "hoped that the strength of [their] evidence would persuade [Mr.] Gonzalez–Lauzan to talk about his participation in the [murder]. The officers planned to give [Mr.] Gonzalez–Lauzan *Miranda* warnings only if it became apparent that [he] would be willing to make a custodial statement." *Id.* at 1130. After stating their belief that Mr. Gonzalez–Lauzan was involved in the murder, and recognizing that he had previously been represented by counsel—to which the appellant said he "knew [his] rights"—the officers told the appellant: "[W]e're not asking you any questions. We don't want you to say anything. We just have something to say to you and we ask that you listen to it so that you can understand where we are coming from." *Id.* at 1131. As the officers presented the evidence, they instructed Mr. Gonzalez several times "just to listen and told him that [they] did not have any questions." *Id.* After two and one-half hours, Mr. Gonzalez–Lauzan "stated suddenly, 'okay, you got me'"; and he was read his *Miranda* rights, but signed a form waiving them. *Id.* He then made a statement confessing his role in the murder.

The District Court suppressed the pre-warning statement, " 'okay, you got me,' " but upon recommendation of a magistrate judge, allowed Mr. Gonzalez–Lauzan's post-warning confession to be admitted into evidence, on the ground that he had waived his *Miranda* rights " 'knowingly, freely and voluntarily,' " and had not been subjected to "threats or coercion" by the police. *Id.* at 1132. After considering both *Elstad* and *Seibert,* the 11th Circuit "conclude[d] that the *Miranda* warnings in [Mr.] Gonzalez–Lauzan's circumstances could and did function effectively, that [he] voluntarily waived his *Miranda* rights, and that [his] warned statements are admissible under both *Elstad* and *Seibert.*" *Id.* at 1137. The court further explained:

> The first phase here did not seek to elicit any incriminating statements as occurred in *Seibert,* but rather the officers repeatedly told [Mr.] Gonzalez–Lauzan just to listen. Also, the officers did not have prewarned incriminating statements with which to cross-examine [him] in order to pressure him to repeat them and thereby undermine the *Miranda* warnings. Nor did [Mr.] Gonzalez–Lauzan's postwarning statements relate to the substance of his single, brief prewarning statement.

*Id.* at 1139. The court also applied the *Seibert* plurality's multi-factor test and Justice Kennedy's narrower test and concluded that "prewarning interaction did not render the *Miranda* warnings ineffective to a reasonable suspect, and [Mr.] Gonzalez–Lauzan's waiver of his *Miranda* rights was voluntary." *Id.*

█ Mr. Hairston's case does not readily fit the classic "question-first" mold of *Seibert.* Nor does it mirror the intimidating "I am in charge" approach of the detective in *Hill;* nor, unlike *Hill,* was there a prewarning confession. Rather, Mr. Hairston's case resembles more the "just listen" pattern of *Gonzalez–Lauzan* and the non-coercive environment and voluntary second phase waiver of both *Elstad* and *Gonzalez–Lauzan.* Detective Irving's first phase recounting of evidence accumulated in the Arrion Johnson murder investigation did not elicit any incriminating statement from Mr. Hairston. The only questions regarding the first phase of De-

tective Irving's meeting with Mr. Hairston are whether Detective Irving's tactic of offering to show Mr. Hairston proof that Mr. Chaney had spoken with the detective and given a statement, was the functional equivalent of interrogation, and whether that tactic had a coercive effect on Mr. Hairston in that it overbore his will. That is, did playing of the videotape of Mr. Chaney speaking with the police, with the sound turned down so that Mr. Hairston could not hear what Mr. Chaney said, constitute the functional equivalent of interrogation, and did it have a coercive impact first on Mr. Hairston's decision to say "yes," he wanted to tell his side of the story, and ultimately on his decision to confess.

Initially, we note that saying, "yes," I want to tell my side of the story (Mr. Hairston), is not the same as saying, "okay, you got me" (Mr. Gonzalez-Lauzan). "[O]kay, you got me," is an obvious incriminating statement, whereas, "yes," I want to tell my side of the story is not. But, even assuming, without deciding, that Detective Irving's first phase tactic was the functional equivalent of interrogation,[16] it resulted in no incriminating statement, and did not run afoul of the essence of *Miranda:* "The government is constitutionally precluded by the Fifth Amendment's self-incrimination clause from using at trial a defendant's incriminating statement made while in custody unless the defendant has been advised of his right to remain silent (as a means of safeguarding the privilege against compulsory self-incrimination) and to be represented by an attorney before he is interrogated." *Hill, supra,* 858 A.2d at 441 (citing *Miranda, supra,* 384 U.S. at 442, 86 S.Ct. 1602;

*Dickerson, supra,* 530 U.S. at 442, 120 S.Ct. 2326).

 Furthermore, even if we "presum[e] coercive effect" as a result of Mr. Hairston's prewarning statement, "yes," I want to tell my side of the story, we see nothing in the record to suggest that this statement was not voluntary. Nothing indicates that Detective Irving said anything to Mr. Hairston to pressure him into acknowledging any role in the murder of Mr. Johnson, as he watched (without sound) the videotape of Mr. Chaney speaking with the police. While one could regard the playing of a silent videotape of Mr. Chaney as Detective Irving's effort to give Mr. Hairston the impression that Mr. Chaney had confessed to a role in the murder of Mr. Johnson and had implicated the appellant here, Mr. Hairston's statement just as reasonably could be interpreted as a manifestation of consciousness of guilt on his part and a voluntary desire to share his own version of what had happened. And, assuming that the latter interpretation would make Mr. Hairston's phase one statement inculpatory, it falls within *Elstad's* cautionary declaration that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." 470 U.S. at 318, 105 S.Ct. 1285.

 Nevertheless, we are left with the question whether the phase two confession of Mr. Hairston should have been excluded because of any "taint" from the phase one session between Detective Irving and Mr. Hairston. Stated in other terms, under *Seibert,* our task is to determine whether the "just listen to the information I have gathered" and the silent Chaney videotape

---

**16.** Assuming it was interrogation, it plainly was a *"deliberate* [use of the] two-step strategy addressed in *Seibert. See Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment) (emphasis added)."

techniques used by Detective Irving during phase one, or the prewarning phase of his interaction with Mr. Hairston, made the *Miranda* warnings administered in the second session of their interaction ineffective. As the Supreme Court stated in *Seibert:*

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

542 U.S. at 611–12, 124 S.Ct. 2601 (footnote omitted). As a guide to determining the effectiveness of the *Miranda* warnings given in phase two of the police/suspect interaction, the plurality in *Seibert* highlighted five factors:

> [T]he completeness and detail of the questions and answers in the first round of interrogation[;]
> the overlapping content of the two statements[;]
> the timing and setting of the first and second [statements;]
> the continuity of police personnel[;] and
> the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601.

Applying these plurality *Seibert* factors to this case, it is clear first that Detective Irving elicited none of the details from Mr. Hairston in phase one that emerged in phase two, and, in fact, the detective asked no questions of Mr. Hairston in phase one, except did he wish to see proof of the fact that Mr. Chaney had already given a statement to Detective Irving. Second, there is no overlapping content between what Mr. Hairston said in phase one and phase two, except that he wanted to tell his side of the story. Thus, the first two factors weigh in favor of concluding that the warnings were effective. As for the third factor, there was close temporal proximity between phase one and phase two of Detective Irving's sessions with Mr. Hairston, and the sessions were conducted in the same interview room. Under the fourth factor, Detective Irving was the same officer during both sessions with Mr. Hairston. While the third and fourth factors weigh in favor of Mr. Hairston, only minimal weight is accorded them because no questions were asked or responses given in phase one. And, application of the fifth factor reveals that the second phase was not "continuous with the first" in that in the first session Detective Irving posed no questions to Mr. Hairston about the details of the murder, as he did in the second phase. Hence, this factor also weighs in favor of concluding that the warnings were effective.

Unlike the first phase in *Seibert,* we cannot say here that Detective Irving's unwarned questioning of Mr. Hairston in the first phase was so "systematic, exhaustive, and managed with psychological skill," that when "the [detective was] finished there was little, if anything, of incriminating potential left unsaid." *Id.* at 616, 124 S.Ct. 2601. Indeed, after Detective Irving's first phase with Mr. Hairston, there was no statement from Mr. Hairston linking him to the specifics of Mr. Johnson's murder, only his uninformative state-

ment that he wanted to tell his side of the story. That statement by itself was insufficient to implicate Mr. Hairston as a principal or an abetter of the murder of Mr. Johnson. Therefore, the administration of the *Miranda* warnings in phase two of Detective Irving's sessions with Mr. Hairston still could achieve the objective of *Miranda*—that Mr. Hairston be able to " 'mak[e] a free and rational choice' about speaking and ... that a suspect ... be 'adequately and effectively' advised of the choice the Constitution guarantees." *Id.* at 611, 124 S.Ct. 2601 (citing *Miranda, supra,* 384 U.S. at 464–65, 467, 86 S.Ct. 1602).

Although the third and fourth *Seibert* plurality factors weigh in Mr. Hairston's favor with respect to whether the second phase *Miranda* warnings could "adequately and effectively" advise him of his Fifth Amendment constitutional choice about speaking, from the record before us "it is clear that the *Miranda* warnings as administered [to Mr. Hairston] would meaningfully apprise a reasonable suspect of his right or choice to remain silent and thus were effective in this case." *Gonzalez–Lauzan, supra,* 437 F.3d at 1138. In fact, Mr. Hairston exercised his free will in providing only "very vague" answers initially to Detective Irving's questions, and in declining to have his statement videotaped, instead insisting on a typewritten statement, which he signed. And nothing in the record persuades us (as nothing at the suppression hearing convinced the trial judge) that Mr. Hairston's will was overborne while he waited for Detective Irving's first session with him, or during that session. Furthermore, as the trial judge found, "[t]his was not Mr. Hairston's first interaction with the police and he was not under age or particularly vulnerable or in any other way [an] impaired person in terms of understanding his rights[,] and having the ability to decline to participate

in giving [his] statement...." In short, in light of the legal principles articulated in *Elstad, Seibert, Hill,* and *Gonzalez–Lauzan,* and under the specific circumstances of this case, we hold that the trial court did not err by denying Mr. Hairston's motion to suppress his confession.

Our conclusion is not meant to approve a police officer's deliberate decision to withhold *Miranda* warnings prior to speaking with a person who is under arrest. Indeed, we are mindful of what we said in *Brown, supra:* "Depending on context, the seemingly benign transmittal of information to an accused may resemble the kind of mental games that largely generated the *Miranda* decision itself." 737 A.2d at 1021. As we have indicated above, we concluded in *Hill, supra,* that the factual context there, which began with a detective's instruction, "nobody [is] to advise [the suspect] of his rights until I do," "underscore[d] the plan to intimidate appellant by purposely withholding the advicement of rights meant to counteract the pressure inherent in custodial interrogation ...." 858 A.2d at 447. Furthermore, when the Supreme Court affirmed in *Dickerson, supra,* the constitutional nature of its *Miranda* decision, it declared that "custodial police interrogation, by its very nature, isolates and pressures the individual," and also reiterated "that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment ... not to be compelled to incriminate himself.' " 530 U.S. at 435, 120 S.Ct. 2326 (citing *Miranda, supra,* 384 U.S. at 442, 86 S.Ct. 1602). The fact that no incriminating statement was made here during the first phase of Detective Irving's interview with Mr. Hairston does not undercut the importance of the *Miranda* warnings.

## Other Arguments

■ We dispose of Mr. Hairston's other arguments summarily. He maintains that the trial court improperly denied his February 2001 *pro se* post-conviction "Petition for Writ of Habeas Corpus Ad Subjiciedum," which the court "treat[ed] as a motion to vacate sentence pursuant to D.C.Code § 23–110." In that motion he claimed that his attorney rendered ineffective assistance of counsel relating to his arrest and confession, and requested an evidentiary hearing. The trial court denied his request for an evidentiary hearing because his claim "that his counsel failed to pursue the issue of his statement to the police," "is palpably false." The motions judge, who also presided over Mr. Hairston's trial, concluded in a seventeen-page order (in which she reviewed evidence presented at trial and trial counsel's performance) that counsel's performance was not deficient, and that Mr. Hairston failed to satisfy the prejudice prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ Although there is a presumption in favor of holding a hearing on a § 23–110 motion which asserts ineffectiveness of trial counsel, the right to a hearing is not automatic. *Ready v. United States,* 620 A.2d 233, 234 (D.C.1993) (citing *Gibson v. United States,* 388 A.2d 1214, 1216–17 (D.C.1978)). "Where the existing record provides an adequate basis for disposing of the motion, the trial court may rule on the motion without holding an evidentiary hearing." *Ready,* 620 A.2d at 234 (citations omitted). Moreover, "a hearing is unnecessary when the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Id.* (citing *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990)). Here, we conclude that, under *Ready* and

*Ramsey,* the trial court did not err in refusing to hold a hearing on Mr. Hairston's § 23–110 motion. Mr. Hairston presented no affidavit in support of his allegations, as we have required in other cases, and the trial court found his assertions regarding trial counsel and his (Mr. Hairston's) statement to the police "palpably false." *See Ready, supra,* 620 A.2d at 235 ("The absence of an affidavit or other credible proffer ... persuades us that the trial court did not err in declining to hold a hearing.") (footnote omitted); *see also Young v. United States,* 639 A.2d 92, 95 (D.C.1994). Moreover, Mr. Hairston has raised some new allegations on appeal which have not been preserved in the trial court, and hence, we do not consider them. *See Young, supra,* 639 A.2d at 97 n. 8 (citations omitted); *Southall v. United States,* 716 A.2d 183, 189 (D.C.1998).

■ Mr. Hairston argues that the trial court should have granted his motion for judgment of acquittal because there was insufficient evidence of the charge of conspiracy. He maintains that "[i]n the indictment, the grand jury charged [him] with participation in a vast, generalized conspiracy to assault and murder residents of the 1400 block," however at trial, "the Government failed to provide evidence of such a grand conspiracy"; and further, failed to provide any evidence "of an overarching agreement to assault and murder." Moreover, he contends that he and his co-conspirators "did not share a common goal."

■ "In reviewing a claim of insufficient evidence, this court must determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, reviewing the evidence in the light most favorable to the government, and giving full play to the right of the jury to determine credibility, weigh the evidence, and draw

justifiable inferences of fact." *McCoy v. United States,* 890 A.2d 204, 213 (D.C. 2006) (citations and internal quotation marks omitted). "We do not distinguish between direct and circumstantial evidence." *Id.* (citation omitted). To prove conspiracy, the government must establish "that an agreement existed between two or more people to commit a criminal offense; that the defendant knowingly and voluntarily participated in the agreement, intending to commit a criminal objective; and that, in furtherance of and during the conspiracy, a co-conspirator committed at least one overt act." *Id.* at 213–14 (citing *McCullough v. United States,* 827 A.2d 48, 58 (D.C.2003)).

Our review of the record in the light most favorable to the government (considering both credibility issues properly resolved by the jury and reasonable inferences to be drawn from the evidence presented) convinces us that "a rational trier of fact could have found the [] elements of [conspiracy] beyond a reasonable doubt." *McCoy, supra,* 890 A.2d at 213. Compelling evidence regarding the alleged conspiracy was presented by Antoine Evans, who entered guilty pleas to two counts of second-degree murder (one while armed), conspiracy and assault with a dangerous weapon, and Mr. Chaney, who entered pleas to conspiracy, manslaughter while armed, and possession of a firearm during a crime of violence, all relating to the crimes with which Mr. Hairston was charged. The evidence revealed that Mr. Hairston, Mr. Evans and Mr. Chaney discussed and agreed to exact revenge against persons in the 1400 block of Clifton Terrace because of actions and words by two members of that faction. Together with others from the 1300 block faction, Mr. Hairston voluntarily and knowingly participated in the agreement by obtaining guns and ammunition and joining efforts to "catch" members of the 1400 block faction. In furtherance of their agreement, Mr. Evans and Mr. Chaney each committed at least one overt act, and later pled guilty to the crimes resulting from those overt acts. The jury which heard the evidence presented against Mr. Hairston regarding the conspiracy obviously rejected the defense claim of multiple conspiracies, and instead, concluded that there was a single conspiracy. "The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury." *United States v. Tarantino,* 269 U.S.App. D.C. 398, 405, 846 F.2d 1384, 1391 (1988). From the evidence presented, the jury here could reasonably conclude that the defendants shared a common goal, *see United States v. Gatling,* 321 U.S.App. D.C. 63, 72, 96 F.3d 1511, 1520 (1996), that is, seeking revenge against the 1400 block faction. In short, "a reasonable juror could have found that the government had proven all three elements of conspiracy." *McCoy, supra,* 890 A.2d at 214.

Finally, Mr. Hairston contends that he was denied a "fair trial" by the prosecution's closing argument. He complained at trial that the government misstated the law of conspiracy by analogizing "conspiracy liability and membership on a basketball team"; and that the prosecutor expressed a personal opinion by saying, "These men are guilty." He requested a mistrial, which the trial court denied. In denying the request for a mistrial, the trial court said: "I believe that each of the issues that you've raised though not invalid points of contention are ones that can be remedied or already have been remedied." As to the prosecutor's conspiracy argument, the trial judge indicated that she would (and actually did) give instructions as to the law of conspiracy at the close of all counsel arguments, and that in their

closing arguments, defense counsel could respond to the basketball analogy.

The prosecutor's comment, "[t]hose men are guilty," came after the prosecutor spent time asking the jury to find the defendants guilty. After asking the jury to return guilty verdicts, the prosecutor closed by saying: "There is one right thing to do in this case. Those men are guilty." The trial judge expressed the view that the prosecutor's comment "appeared to [her] to be ... precariously close to something that the jurors would perceive as counsel's opinion, ... [b]ut ... within the range of argument it's not illegitimate ... [or] prosecutorial misconduct." The judge reminded counsel that before releasing the jurors for the day, she had instructed them "that arguments of the counsel are of course not evidence." The judge also informed counsel that she would give the jury another instruction, during closing instructions.[17]

During rebuttal argument, the prosecutor declared: "[W]hile Mr. Hairston didn't put on a defense which is his absolute right, Mr. Bullock and Mr. Blunt did...." Counsel for Mr. Hairston made a timely objection and requested a mistrial. In response, the trial court noted that despite the prosecutor's statement that Mr. Hair-

ston was not required to put on a defense, "still arguably some damage is done." The judge determined that it would be appropriate to give an instruction on this issue during final jury instructions, and invited defense counsel to respond to her suggested instruction. Later, without waiving his objection, defense counsel suggested language which the trial judge incorporated verbatim into her final instructions.[18]

■■■ Our review of the prosecutor's closing and rebuttal arguments, and the trial court's response to objections thereto, satisfies us that the trial judge properly denied the defense request for a mistrial.[19] After considering whether the prosecutor's comments were improper, and if so, "the gravity of the remark, its relationship to guilt, whether the court made corrective instructions, and the strength of the government's case," we conclude, "with fair assurance, after pondering all that happened without stripping [any] erroneous action from the whole, that the judgment was not substantially swayed by [any] error." *Williams v. United States,* 859 A.2d 130, 141–42 (D.C.2004) (quoting *Diaz v. United States,* 716 A.2d 173, 181 (D.C. 1998)) (other citations and internal quota-

---

**17.** During her closing instructions, the judge told the jury:

> The statements and arguments of the lawyers are not evidence. They're only intended to assist you in understanding the evidence. Occasionally an attorney may appear to state his or her personal belief or opinion as [to] the believability of evidence. Such personal opinions are not evidence and should not be considered by you as such.

**18.** The instruction read:

> Every defendant in a criminal case has an absolute right not to testify and not to call witnesses or present an affirmative defense. You must not draw any inference of guilt against any defendant because he did not

testify, or call witnesses or present an affirmative defense.

In an earlier portion of her final instructions, the judge informed the jury that:

> The burden is on the government to prove the defendant guilty beyond a reasonable doubt. This burden of proof never shifts throughout the trial. The law does not require a defendant to prove his or her innocence or to produce any evidence.

**19.** Although Mr. Hairston argues in his brief that his Fifth Amendment right against self-incrimination was violated by the government's reference to the fact that he did not put on a defense, he did not explicitly raise a Fifth Amendment argument at trial, and hence, did not preserve it. *Young, supra,* 639 A.2d at 97 n. 8.

tion marks omitted). The curative instructions given by the trial court to the jury were sufficient in this case to overcome any improper comment by the prosecutor. *See Harris v. United States,* 602 A.2d 154, 165 (D.C.1992) (the jury is presumed to have followed the trial court's instructions).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

SCHWELB, Senior Judge, concurring:

In *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court, in an opinion by the late Chief Justice Rehnquist, reiterated the Court's conclusion in *Miranda* that "coercion [is] inherent in custodial interrogation" and that such coercion "blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Id.* at 435, 120 S.Ct. 2326 (internal quotation marks and ellipsis omitted). This is so because "custodial police interrogation, by its very nature, isolates and pressures the individual." *Id.* The remedy prescribed by the Court in *Miranda* for the inherent pressure of the station house was to require the police to advise the suspect in custody, before interrogation begins, of his right (*inter alia*) not to make a statement and of his right to counsel.

Footnote 7 to the court's opinion in this case tells a remarkable story. Detective Irving freely acknowledged that he told officers not to advise Hairston of his rights before he (Irving) spoke to Hairston. The detective did so because, in the words of defense counsel which Irving described as correct, Irving "didn't want to run the risk of Hairston['s] invoking his right to remain silent or his right not to speak in the absence of counsel." Detective Irving "wanted to get in there and talk to him without [Hairston] having his rights being read to him," so that Irving could "get whatever information [he] could get out of him."

It is apparent from the foregoing that Detective Irving was making a deliberate effort to insure that the protection prescribed by *Miranda* to counteract the coercion "inherent in custodial interrogation"—namely, the advice of rights—be withheld until he had conditioned Hairston psychologically to be ready to waive those rights. In other words, Irving contrived to maintain the pressure inherent in isolation in the station house until interrogation began. Detective Irving obviously believed, not unreasonably, that Hairston's isolation in coercive surroundings made it more likely that he would make an incriminating statement than it would have been if Hairston had been advised of his rights immediately upon his arrest. Indeed, it was the essence of Detective Irving's strategy to keep Hairston in ignorance of his rights for as long as he could, and to let the atmospherics incident to being isolated and in custody at the police station take their emotional toll.

This does not mean, however, that we must reverse. Notwithstanding his restraint and isolation, Hairston made no incriminating statement until after Irving had finally advised him of his rights. There is no indication that, at that point, Hairston did not understand these rights. Under these circumstances, like the court, I know of no authority for the proposition that Irving's conduct violated rights secured by *Miranda*. Indeed, since Irving planned to emphasize that he wanted Hairston to listen rather than to talk during the period preceding the advice of rights, it is not obvious that any custodial interro-

gation had taken place at that stage of the interview. There having been no pre-*Miranda* warning inculpatory statement, I am constrained to concur in the judgment of the court, and, except perhaps in emphasis, I agree with the court's legal analysis.

Nevertheless, I think it worth noting that, realistically, "the coercion inherent in custodial interrogation" does not begin when the detective asks the suspect the first question. Events that precede interrogation can also be coercive. Here, Hairston was arrested at 10:00 p.m. He was placed in a small interrogation room and handcuffed to a chair. He had no opportunity to talk to an attorney or to any member of his family. When Detective Irving arrived between 11:30 p.m. and midnight, Hairston had been thus isolated and restrained for a least one and a half hours. By the time the detective advised Hairston of his rights, Hairston had been in this situation for almost three hours, and the interview did not end until 3:18 a.m.

Detective Irving's handling of Hairston's case closely resembled the process, described in the police handbooks, which was criticized by the Court in *Miranda:*

> The officers are told by the manuals that the "principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation." The efficacy of this tactic has been explained as follows:
>
> > "If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indis-

cretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law."

> To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details.

384 U.S. at 449–50, 86 S.Ct. 1602 (emphasis in original) (footnote omitted).

Although Hairston has not shown that the *rule* of *Miranda* was violated here, Irving undoubtedly attempted to use to his advantage the intrinsic coerciveness of Hairston's circumstances, and he succeeded in eliciting an incriminating statement from Hairston which Hairston might well not have made if Irving had not contrived to inhibit Hairston's exercise of his *Miranda* rights. We have admonished the police on several previous occasions regarding the "obvious impropriety" of "the deliberate failure of the police to inform a criminal suspect *promptly* of his rights under *Miranda.*" *Hill v. United States,* 858 A.2d 435, 438 (D.C.2004) (citations omitted).[20] I do not believe that "promptly" should mean at "any time before questioning begins," especially when the defendant has been restrained and isolated from family and counsel, and thus subjected to an intimidating atmosphere, for several hours. I therefore take little pleasure in sustaining the kind of police tactic reflected in this record. To me, it represents exploitation of the prospective defendant's fear and ignorance; *Miranda* was

---

**20.** *Hill* is distinguishable from this case, however, because in *Hill* the defendant made an inculpatory statement *before* he had been advised of his rights.

designed at least to alleviate such exploitation.

"The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of [evasion]." *Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). The rule of *Miranda* is not the equivalent of a liberating Amendment to the Constitution, but it, too, is constitutionally based. Although I find no authority for reversal here, courts should be alert to "sophisticated" nullification of the rights secured by *Miranda.* The present record is disquieting in this regard.